**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| 2017 IAVF WINDY CITY FOX RUN LLC | ) | Case No. 20-18377 |
| | ) | (Joint Administration Requested) |
| Debtors.[1] | ) | |
| | ) | Hon. Jack B. Schmetterer |
| | ) | |

## DECLARATION OF ANDREW BELEW IN SUPPORT OF CHAPTER 11 CASES

I, Andrew Belew, hereby declare under penalty and perjury.

1.      I am the current President and Chairman of Better Housing Foundation, Inc., an Ohio not-for-profit company ("BHF"). BHF is the sole member of eight separate limited liability companies, each of which owns portfolios of affordable housing units. One such portfolio are the above-captioned debtors, 2017 IAVF Windy City Fox Run LLC ("Fox Run"); 2017 IAVF Windy City Shaddle LLC ("Shaddle"); 2017 IAVF Windy City Villa Brook LLC ("Villa Brook"); and 2017 IAVF Windy City Parkside LLC ("Parkside") (collectively, the "Debtors").

2.      BHF is also the manager of Debtors. The Debtors' day-to-day operations are managed by Consilium Capital Partners LLC ("Consilium").  Since its founding in 2012, Consilium has managed over 5,000 multifamily units in high growth markets across the United States.  I am the sole member and managing director of Consilium.  As such, I am familiar with the Debtors' operations, day-to-day business, affairs, and books and records. I submit this Declaration to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of this Chapter 11 case.

---

[1] The Debtors in these Chapter 11 cases, sought to be jointly administered, are 2017 IAVF Windy City Fox Run LLC (Case No. 20-18377); 2017 IAVF Windy City Parkside LLC (Case No. 20-18379); 2017 IAVF Windy City Shaddle LLC (Case No. 20-18380); and 2017 IAVF Windy City Villa Brook LLC (Case No. 20-18381).

3.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussion with present and former board members of BHF, my review of relevant documents or my opinion, based on my experience and knowledge of the Debtors' operation and financial condition. In making this declaration, I have relied, in part, on information and materials that the prior owners of BHF have gathered, prepared, and provided to me.

4.      BHF was formed in 2015 for the purpose of acquiring portfolios of affordable housing in the greater Chicago area, including the Debtors, which are located in the northern and western suburbs.  The Debtors are, collectively, the owners of "Portfolio D."  In addition to the Debtors, BHF is the sole member of four (4) other not-for-profit entities that own portfolios of affordable housing units:

      a.      "Portfolio A" consists solely of Lindran Properties, LLC (Shoreline), which is currently a debtor-in-possession in a Chapter 11 case pending as Case No. 20-02834.  The assets of Portfolio A have been sold and transferred to a third-party purchaser pursuant to 11 U.S.C. § 363(b).

      b.      "Portfolio B" consists of the properties owned by BHF Chicago Housing Group B LLC, which is currently a debtor-in-possession in a Chapter 11 case pending as Case No. 20-12453.  An auction for Portfolio B's assets was held on October 2, 2020, and a sale hearing for the approval of the sale is set for October 20, 2020.

      c.      "Portfolio C" consists of the properties owned by BHF Chicago Housing Group C LLC, which is currently a debtor-in-possession in a Chapter 11 case pending as Case No. 20-16567.  On September 15, 2020, the Court entered an order

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

approving the sale procedures for the assets of Portfolio C.  The deadline for bids

for Portfolio C is November 3, 2020.

5.      The non-debtor portfolio is "Portfolio E," which consists of 2018 Blue Island LLC

(collectively, Portfolio A, Portfolio B, Portfolio C, and Portfolio E shall be the "Affiliated Entities").

None of the assets of the Debtors or any Affiliated Entities are cross-collateralized with any asset

of any other Affiliated Entities.  Neither the Debtors nor BHF are a guarantor for any of the

Affiliated Entities.

6.      The current BHF Board assumed control of the Debtors, the Affiliated Entities, and

BHF on November 26, 2018.

**The Current Debtors are Distinguishable from Portfolios A-C and Continue to Provide
Affordable Housing**

7.      The Debtors are financially, geographically, and physically distinguishable from

the other debtor portfolios: Portfolio A, Portfolio B, and Portfolio C (collectively, "Portfolios A-

C").  All of the properties owned by Portfolios A-C are located on the south side of Chicago, were

in a dilapidated condition when the current BHF Board assumed control, and had state court

appointed receivers in possession and control of the respective real property at the time of the

respective bankruptcy filings.  None of these conditions are attendant with the Debtors. The

Debtors have high occupancy rates, do not have receivers in place, and are, generally, in good

condition.

8.      Fox Run was formed as a single-purpose entity in 2017 for the purpose of acquiring

220 separate affordable housing residential units, commonly known as the "Fox Run Apartments,"

located at 115, 135, 145, 155, and 225 Walnut Drive in St. Charles, Illinois (the "Fox Run

Property").

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

9.      Shaddle was formed as a single-purpose entity in 2017 for the purpose of acquiring 70 separate affordable housing residential units, commonly known as the "Shaddle Apartments," located at 40 South Shaddle Avenue in Mundelein, Illinois (the "Shaddle Property")

10.      Villa Brook was formed as a single-purpose entity in 2017 for the purpose of acquiring 118 separate affordable housing residential units, commonly known as the "Villa Brook Apartments," located at 103-195 South Villa Avenue in Addison, Illinois (the "Villa Brook Property")

11.      Parkside was formed as a single-purpose entity in 2017 for the purpose of acquiring 120 separate affordable housing residential units, commonly known as the "Parkside Apartments," located at 16 North Parkside Avenue, Glen Ellyn, Illinois (the "Parkside Property").  The Fox Run Property, Shaddle Property, Villa Brook Property, and Parkside Property shall collectively be referred to as the "Property."

12.      The Debtors' acquisition of the Property was financed by the issuance of $59,980,000 of secured bond obligations consisting of $49,630,000 of Series 2017A-1, tax-exempt Multi-Family Housing Revenue Bonds; $2,355,000 of taxable Multi-Family Housing Revenue Bonds, Series 2017A-2; and $7,995,000 of Subordinate Series 2018BA Multi-Family Housing Revenue Bonds (collectively, the "Bonds").  The Bonds were issued pursuant to a Trust Indenture dated as of November 16, 2017 (the "Indenture"), between the Illinois Finance Association (the "Issuer") and Wilmington Trust Company, the original Bond trustee (the "Prior Trustee").  UMB Bank, N.A. is the duly-appointed and acting successor trustee (the "Trustee") under the Indenture.

13.      The Bonds are secured, in part, by a Loan Agreement dated November 16, 2017 (the "Loan Agreement") between the Issuer and the Debtor.  The proceeds of the Bonds were loaned to the Debtors, then under the control of a prior board, pursuant to the Loan Agreement.

4

The Loan Agreement and related loan documents were assigned to the Trustee to secure the repayment of the Bonds. The Bonds are also secured, in part, by certain Mortgage, Security Agreements and Financing Statements dated November 21, 2017 (collectively, the "Mortgage"), between the Debtors, as mortgagor, and the Prior Trustee, as mortgagee. The Mortgage and related mortgage documents have been assigned to the Trustee to secure repayment of the Bonds. The Trustee was granted a security interest, in part, in all the Debtors' buildings and improvements thereon.

14.     In early to mid-2019, in order to finance rehabilitation and repair cost incurred by Portfolio A, the Debtors made unsecured loans to Portfolio A. At the times the loans were made, the Prior Trustee was the duly appointed trustee under the Indenture. Specifically,

     a.     Fox Run loaned $222,638.41 to Portfolio A;

     b.     Shaddle loaned $67,663.96 to Portfolio A;

     c.     Villa Brook loaned $85,589.99 to Portfolio A;

     d.     Parkside loaned the $41,808.24 to Portfolio A.

15.     During that same period, in order to finance rehabilitation and repair cost incurred by Portfolio B, the Debtors made unsecured loans to Portfolio B. Specifically,

     a.     Fox Run loaned $410,271.95 to Portfolio B;

     b.     Shaddle loaned $56,248.58 to Portfolio B;

     c.     Villa Brook loaned $56,915.47 to Portfolio B;

     d.     Parkside loaned $115,206.68 to Portfolio B.

16.     The aforementioned loans are evidenced by promissory notes that were executed contemporaneously when the aforementioned loans were made. The Debtors previously entered into a waiver agreement waiving their claims against the Portfolio A and Portfolio B, knowing

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

there would be no chance for recovery.  Indeed, Portfolio A was sold for $3,900,000 and the trustee of Portfolio A was owed over $16,000,000. The auction of Portfolio B will produce a similar result as the trustee of Portfolio B is owed over $56,000,000, and the highest and best bid was $18,625,000.  The Trustee was not provided notice of the execution of the waiver agreement until after the waiver agreement was executed.  The Trustee never consented to the execution of the waiver agreement.  The waiver agreement is without prejudice to the rights of the Trustee to assert claims against Portfolio A, Portfolio B and/or the Debtors.

**The Debtors' Continued Operations as a Provider of Affordable Housing**

17.     The Debtors' business model, as established by prior ownership, was flawed at the onset.  The Debtors believed that they would be exempt from paying real estate taxes because of their not-for-profit status.  However, this material miscalculation by prior ownership permanently burdened the Debtors with insufficient capital.  Once prior ownership recognized it was required to pay real estate taxes, which aggregate to over $1,000,000 per year, its carry cost increased and the funds available to maintain the Property decreased even further.  As a result of the need to attract new capital, the prior ownership sought outside guidance.

18.     In August of 2018, a non-profit entity named Invest in America's Veterans Foundation ("IAVF"), took control of the BHF Board with the intent to operate, stabilize and rehabilitate the Property.  By that time, BHF's previous board members resigned in full.  In November of 2018, IAVF informed me that as a result of what they learned during their due diligence, they felt they did not possess the knowledge, experience or capital to properly achieve this ambitious objective.  Based on my background in dealing with distressed real estate, I believed my team possessed the skill set to rehabilitate the Property.  We agreed to take over the BHF Board on November 26, 2018. By taking over BHF, we intended to improve BHF and its holdings,

6

including the Debtors, and to enhance our resume as an enterprise specifically designed to assist other struggling, non-profit, real estate entities.

19.     Once my team took over control, we began to turnaround the operations of the Debtors and increase occupancy of the Property.  Shortly after my assumption of control of BHF, I authorized the employment of Paper Street Realty, LLC ("Paper Street"), the property management company selected by prior ownership, to continue managing the day-to-day operation of the Property.

20.     Unfortunately, Paper Street badly mismanaged the Property and, in July 2019, I terminated Paper Street's employment as property manager for the Debtors.  Prior to turning over control of the Debtors' operations, Paper Street absconded with more than $277,000 of the Debtors and Portfolio E's money.  The Debtors and Portfolio E have filed suit to recover these funds from Paper Street, and Paper Street has filed counterclaims against the Debtors and Portfolio E.  The Debtors are in the process of determining whether to remove the Paper Street action to Bankruptcy Court to resolve the matters contemporaneously with the disposition of the Debtors' real estate assets.

21.     Following the termination of Paper Street, I appointed Consilium as property manager for the Property.  I formed Consilium in 2012 and, since its founding, Consilium has managed over 5,000 multifamily units in high growth markets across the United States.  At the time of Paper Street's dismissal, the occupancy for Property fluctuated between the low-to-mid 80% range.  Since Consilium took over management for the Property, the occupancy for the Shaddle Property has increased to was 92%; Villa Brook to 89%, and Parkside to 90%.  The occupancy for the Fox Run Property is currently 72% only as a result of the COVID-19 pandemic. Many of the tenants in the Fox Run Property, located in St. Charles, Illinois, are in the service and

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

retail industries, and the lack of employment opportunities in these industries has caused a precipitous drop in occupancy.  Since the onset of the pandemic, the monthly rents at Fox Run have declined by nearly $45,000 per month.

22.     Consilium is paid based solely on the gross revenue of the Debtors.  Each month, Consilium receives an industry standard 3% of gross revenues with which it pays for, *inter alia*, all insurance for the Property.  The Debtors, through Consilium, currently employ eleven (11) full-time employees for the day-to-day management and maintenance of the Property. These employees consist of property managers, maintenance supervisors, and maintenance technicians. There are two (2) employees at the Shaddle Property, two (2) employees at the Parkside Property (both reside on location), two (2) employees at the Villa Brook Property (both reside on location), and five (5) employees at the Fox Run Property (two reside on location).

23.     Each of the Debtors has three (3) bank accounts with Fifth Third Bank, a rent account, tenant security deposit account and operating account.  Many, if not most, of the tenants at the Property will pay monthly rent by physically walking a paper check down to the on-site management site.  The property manager will then use the on-site check scanner to directly deposit the check into the respective Debtor's rent account.  Other tenants will pay through a direct deposit to the appropriate Debtor.  The Debtors will then transfer funds from the rent account to the operating account to timely pay accounts payable.  As of the Petition Date, the Debtors currently had the following balances at Fifth Third Bank:

| Type of Account | Fox Run | Shaddle | Villa Brook | Parkside |
|---|---|---|---|---|
| **Rent** | $108,482.82 | $65,592.30 | $108,485.62 | $190,299.95 |
| Acct No. | -2641 | -1593 | -2161 | -2534 |
| **Operating** | $69,780.03 | $49,516.14 | $49,787.92 | $23,663.12 |
| Acct No. | -2625 | -1577 | -2153 | -2518 |
| **Deposit** | $54,648.51 | $26,645.11 | $17,535.12 | $11,243.62 |
| Acct No. | -2666 | -1619 | -2179 | -2559 |
| **Total** | **$232,911.36** | **$141,753.55** | **$175,808.66** | **$225,206.69** |

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

24.    The employees are paid on a bi-monthly basis. The accounting and payroll services for the Property is done by Ascent Multifamily Accounting ("Ascent"). Ascent is an unrelated full-service outsourcing firm that focuses exclusively on accounting services for the apartment industry. Generally, the bi-monthly payroll is withdrawn from the Debtors' operating accounts two (2) days prior to the end of the payroll period and deposited with Ascent to fund and distribute payroll. Prior to the Petition Date, the Debtor fully funded all payroll liabilities for the payroll period of September 28, 2020 to October 9, 2020. Many of the Debtors' employees live paycheck to paycheck and Consilium wanted to ensure the employees would timely get paid without delay.

25.    The Debtors in the aggregate average monthly gross revenues of approximately $425,000-$450,000. However, the monthly obligations under the Bonds is $324,245, leaving just $100,000-$125,000 to operate the entire Property, not including the reserves for the Bonds or any property tax payments. The annual property taxes for the Property exceed $1,000,000, thereby eliminating any additional funds to operate the Property. Generally, the monthly operating costs for the Property average $250,000-$300,000 per month. Moreover, the Debtors have undertaken material repairs and deferred maintenance at the Property in recent months, including, without limitation, new sewer lines, water valves, and electrical vaults. The Debtors cannot sustain any long-term financial stability without a sale of Property and restructuring of the debt secured against the Property.

**Debtor has Extensively Marketed the Property**

26.    Over the past nine months, in light of the Debtors' on-going financial instability, the Debtors have been actively involved in negotiating a transaction that would transfer ownership of the Property and allow an infusion of new capital to rehabilitate the Property. Over the marketing period, the Debtors have received five (5) letters of interest for the purchase of the

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

Property (collectively, the "LOIs").  The various offers ranged from $25,000,000 to $39,000,000, with extreme variations on contingencies and due diligence requirements for the LOIs.

27.      After months of negotiations, in consultation with the Trustee, the Debtors have entered into a stalking horse bid with ACG Iowa Acquisitions LLC, an Iowa limited liability company ("ACG"). ACG is an unrelated third party and has offered to buy the Property free and clear of liens, claims and encumbrances for $39,000,000.00, as adjusted for customary closing costs.  The Debtors also intend to hire Marcus & Millichap as a real estate broker ("M&M") to further market the Property during the bankruptcy cases.  The Debtors are hopeful that through M&M's vast marketing network and those parties that showed an interest in the Portfolios A-C, in addition to those parties that submitted LOIs for the Property, the Debtors will have a robust marketing and sale process for the Property.

**The Purpose of This Bankruptcy Case is to Transition the Property to a New Owner**

28.      The initial goal of the bankruptcy filing is to consummate a transaction, or a series of transactions under § 363 of the Bankruptcy Code with a third party, free and clear of liens, claims and encumbrances. The Debtors believe that by consummating this transaction they will be able to transfer ownership of the Property to new owners who are better capitalized, without the existing bond debt, thus stabilizing the Property for the community and existing tenants.

29.      The Chapter 11 case stands to protect the claims and interests of the Debtors' tenants, their creditors, the community, and other parties-in-interest.

30.      The Debtors' goal in these Chapter 11 cases are to achieve an orderly, efficient, consensual and successful transaction that maximizes the value of the Debtors' estates for the stakeholders and the tenants. I believe if the Court grants the relief requested in the sale hearing,

DM_US 173479368-2.083118.0035
J8272\408745\260922507.v4

the prospects of achieving those objectives and completing a successful transaction of the Debtors'

assets will be substantially enhanced.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the forgoing statements

are true and correct.

Dated: October __7__ , 2020

*Andrew Belew*

ANDREW BELEW

J8272\408745\260922507.v3
DM_US 173479368-2.083118.0035